HARRY C. DILATUSH

*v.*

EDNA R. DILATUSH.

[Submitted June 26th, 1916.   Decided July 12th, 1916.]

1. In a husband's action· for divorce on ground of adultery, evidence *Held* circumstantially to prove defendant's guilt.

2. A husband's desire to be rid of his wife, allowing her to pursue her own course, and failing to prevent her from committing adultery, is not such connivance as prevents him from securing a divorce.

*Mr. John H. Kafes* and *Messrs. Hutchinson & Hutchinson,* for the petitioner.

*Mr. Hervey S. Moore,* for the· defendant.

BACKES, V. C.

The petitioner charges his wife with adultery, alleged to have been committed with one Clement.   She counter-charges, naming one Cassie Olden and a woman named Helen.   The evidence does not sustain the cross-petition and it will be dismissed.

The parties were married September 2d, 1914, and after a short and unhappy existence, separated a year and two months later, under articles.   One child was born to them.   After the separation, the defendant, a young girl, with her infant, took up her residence at a boarding-house on Arch street, Philadelphia, and joined a theatrical company.   Shortly afterwards she moved to a rooming-house, No. 109 North 19th street.   On the morning of January 1st last, about three-ten, the petitioner, with three detectives, found her in her bedroom with the corespondent.   She was undressed, except as to a night-gown and a kimono.   Clement had his coat, collar, tie and shoes, or shoe off, and some of the witnesses say he was holding up his pants.   The folding-bed in the room was open and mussed.

The baby was on it asleep. The defendant and Clement were fellow-boarders at the Arch street house, and after she took the room at the North 19th street house, Clement was a frequent visitor both day and night. On New Year's Eve the two left the house shortly after seven o'clock and went to a theatre. The rest of the evening, and until two-thirty in the morning, they, with another couple, spent at a dance and in cafes, all drinking more or less. Their companions were a man called "Doc," the room-mate of Clement at the Arch street boarding-house, and a girl of the name of Algor, who, apparently, came to Philadelphia purposely to spend New Year's Eve with him. I fear that their friendship was not of the platonic variety. On the way home the couples separated, Clement and the defendant arriving at the latter's room at two-thirty A. M. They had stopped on their way to buy sandwiches. At three-ten the detectives knocked on the defendant's bedroom door. Her room was on the first floor front. The knocking was repeated three or four times, and after some commotion inside, the door was opened by the defendant and the detectives and the petitioner entered. The gas light was burning low. A picture of Clement was hanging on the wall and the sandwiches were untouched. There is some difference in the testimony as to what followed in the excitement. It does not appear that the defendant, at the time, directly denied her guilt, but she did characterize the affair as a "frame-up," and accuse Clement of being a party to the plot. Whether Clement used words of endearment towards the defendant, and promised to take care of her and the baby, is not the recollection of all of the witnesses. That the defendant was agitated and highly indignant, due to a feeling that her confidence had been betrayed by Clement, all agree. The defendant and the co-respondent positively deny wrong-doing. The co-respondent says he had intended spending the remainder of the night in the defendant's bedroom, because he did not care at that hour of the morning to go to his boarding-house, and that on the way to the defendant's room he gave some intimation of this. He says he took off his coat and his shoe from his lame foot because it hurt him. The defendant says that when they got to the room, Clement told her of his intention to stay and

his reasons, and that after protesting and being persuaded by him that it would not be wrong if he remained, she consented. She says she undressed in his presence, but without exposure, being shielded by a bureau, and that he, during the operation, turned his head. She also claims that she responded promptly when the knock came at the door. The explanations of Clement's presence in the room are so weak and incredible as to fall with their utterance, and they likewise destroy any value which otherwise might be given to the denials of guilt. In the face of the uncontroverted circumstances already pointed out, and others to which allusions will be immediately made, there can be no doubt, it seems to me, of a criminal attachment between the two. If, as the defendant says, she permitted Clement to remain simply as a matter of shelter and because she could not turn him away after his kindness of the evening before, why did she disrobe? Why, for pastime's sake, at least, weren't the sandwiches eaten during the forty minutes they were in the room together? If Clement's presence was innocent, why the door closed and the light turned low? And why wasn't the door opened immediately? Only a few days before, Clement was in the room alone with the defendant about midnight and for more than a half-hour. That evening had been spent at a dance at the Bingham House. They were constantly together by day and night before and after the escapade of New Year's and why? He says, out of pity, and she says, due to comradeship. If these were the only motive and object, there could be little cause for complaint, but there were others and of sinister tendencies. He called her by her first name, and sometimes "Dear," jokingly, he says. Why his picture prominently hung on the wall of her bedroom? What hold did the defendant presume she had upon Clement's affections when she remonstrated with him for looking at another girl? He testified that one Sunday afternoon, while he was in her room, she asked him what he was looking at, and being told that it was a good-looking girl who was passing by, she said, "My husband used to do these things to me and I resented them, and I resent them more so from you, being a stranger." And, if her relations with Clement were pure, why did she permit him to upbraid her for her conduct, and to in-

sist upon this as a right, because he was putting up the "dough?" And, why put up the "dough" at all, unless his interest in her was that of criminal intimacy? Mrs. Hart, the keeper of the rooming-house, overheard the quarrel, and it is admitted that Clement paid her $2 to release the defendant's wearing apparel when she finally left.

Upon the argument, counsel for the defendant urged that the view I took of the defendant's conduct in the case of *Cooper* v. *Cooper, 82 N. J. Eq. 581; affirmed, Ibid. 660*, ought to influence and control me in the present case. At a glance it will be seen that the circumstances are altogether different. In that case, it is true, Mrs. Cooper disregarded conventionalities to a marked degree, but the controlling factor of the decision was the entire absence of depravity in her make-up. This element, present or absent, is most important and potential in making for guilt or innocence. In the present case, we have a different sort of a woman to deal with. Her admitted derelictions speak strongly against her plea of innocence. The fact that she undressed in the presence of the co-respondent shows a reckless spirit, a disregard for decency and an utter lack of honor and sense of shame. Her conduct while living with her husband is also an indication of her moral code, and of her inclinations. A policeman testified that upon two occasions he saw her on the streets of Trenton after two o'clock in the morning, walking with a man of whom her husband was, undoubtedly, jealous; at one time linked arm in arm with him. The happenings may have been innocent, but they were left unexplained by the defendant. Upon another occasion, after theatre, she flirted with a stranger, a soap salesman, and with him went to a hotel where they drank until one o'clock in the morning.

The case made against the defendant, of course, is purely circumstantial, and if the facts can, in anywise, be reconciled with innocence, we must adopt that view. We ought not to move upon the outward appearance of things merely, for they ofttimes belie the truth, and we should not judge and condemn even though they arouse profound suspicion. The circumstances must be such as to lead the guarded discretion of a reasonable and just mind to a satisfactory conviction that the crime has

been committed. Here, the general tendency and predisposition of the defendant towards waywardness; the great and unsatisfactorily explained intimacy between her and the co-respondent, and the unrestrained freedom and liberties with each other, when coupled with the flagrantly compromising situation in which they were found on New Year's morning, leave not the shadow of a doubt in my mind of their guilty love, and that they availed themselves of their many opportunities to gratify their lust.

Though the defendant be guilty, it is argued that the petitioner is not entitled to relief because of connivance at his wife's crime. Of this, there is no proof whatever. The unholy alliance which sprung up between the co-respondent and the defendant, after her separation from her husband, and which has resulted in such dire consequences to her, was in nowise contrived, invited or encouraged by the petitioner. It was solely the work of the defendant. Suspecting her infidelity, the petitioner set a watch upon his wife to obtain proof. While it was in the power of the petitioner to prevent the crime on New Year's morning by intercepting his wife, he was not called upon to do so by that duty of protection which is ordinarily required of a husband. He was strictly within his rights in refraining; and culpability cannot be imputed to him for allowing his wife to avail herself of the opportunities she created for indulging her licentious desires. *Warn* v. *Warn, 59 N. J. Eq. 642; Lehman* v. *Lehman, 78 N. J. Eq. 316.*

But, it is insisted, that, even though he did not directly contrive the immediate offence of which his wife stands convicted, the petitioner is barred, because, while living in the marital state, his chief desire was his wife's downfall, and by his whole course of conduct towards her contributed to that end. And, in this connection, it is contended that the separation agreement was the perfection of a scheme on his part to give her liberty and license and pave her way to ruin, which he conceived would be the culmination. That the petitioner fell far short in the discharge of his marital obligations; that the marriage ties were irksome and distasteful, and that he wanted to be rid of his wife; that his deportment and attitude towards her, and his

shameless disclosures of their bed-chamber secrets to his companions, were most despicable, cannot be questioned. That he was willing to give his wife a free rein to perdition, if she so chose, I have no doubt. She went her way and sinned, not by his procurement, but of her own volition. His conduct, reprehensible as it was, was not connivance in the legal sense, as laid down by the authorities, and he cannot be deprived of his right to a decree.

The infant is now in the custody of the mother of the defendant, a respectable and refined woman, as she appeared to be, from my observation, while on the witness-stand. The custody of the child will be awarded to the mother so long as it remains in the care of the grandmother, and the petitioner will be compelled to provide for its support.